THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* JOE D. GALMORE, Defendant-Appellant.

(No. 56386; ■■■■■■■■)

First District—April 14, 1972.

Gerald W. Getty, Public Defender, of Chicago, (Harold A. Cowen, Ronald P. Katz, and James J. Doherty, Assistant Public Defenders, of counsel,) for appellant.

Edward V. Hanrahan, State's Attorney, of Chicago, (Robert A. Novelle and Stephen Connolly, Assistant State's Attorneys, of counsel,) for the People.

Mr. PRESIDING JUSTICE LORENZ delivered the opinion of the court:

Defendant, together with Wendell McMorris, Peter Warren and James Edwards were indicted for murder and tried by the court without a jury. At the close of the State's case in chief a finding of not guilty was entered in favor of McMorris, Warren and Edwards. Subsequently, defendant was found guilty of voluntary manslaughter and sentenced to a term of twelve to twenty years. He appealed directly to the Supreme Court, but, on motion of the State, the cause was transferred to this court.

On appeal defendant contends: (1) that he was not proven guilty of voluntary manslaughter beyond a reasonable doubt and (2) that the sentence imposed upon him was excessive.

The evidence presented by the State is summarized as follows.

Danny Smith testified that at approximately 8:30 P.M. on December 26, 1969, he went to a three-story building at 117 North Albany where he saw some friends one of whom was Coolidge Gandy. The building was "shared" by the "East Side Executioners" and the "Syndicate Vice

Lords." Gandy, Smith and four other male companions, Leslie Mc-Cawley, John Patrick, Michael Hooker and Glen Willis, took some girls home and returned to the building where they found Gandy's first floor room ransacked. The six immediately went to defendant's third floor room where they found "Rabbit" (Peter Warren) and "Little Man." "Jimmy," who was also in defendant's room, had a sawed-off shotgun which Smith tried unsuccessfully to seize. McCawley, Hooker and Willis left the room after being there only a few minutes. Smith then saw defendant, known as Hercules, come out of the closet. Without saying a word defendant put the shotgun to Gandy's forehead and fired. Defendant then told Smith "I'm going to kill all you E's". Smith begged for his life, but defendant told him to "get up against the window" with Patrick and "Tootsie." Defendant said he had shot Gandy because he had raped defendant's girlfriend and "Beat him out of a T.V." Smith leaped out of a window, held onto a ledge, jumped to the ground, heard a gunshot, and ran to his girlfriend's house. Smith heard no conversation between defendant and Gandy that evening. Willis, Hooker, Gandy, Patrick and Smith were members of the "East Side Executioners," an organization which possessed shotguns, but had no weapons with them that night. Defendant did not seem to be acting abnormally and he did not smell of liquor. Smith told his story to the police when they came to him about two weeks after the shooting. He explained that he did not go to the police because of fear.

Michael Hooker testified that at approximately 7:00 P.M. on December 26, 1969, he, Gandy, Mc Cawley, Patrick and Willis went to the building at 117 North Albany. After seeing that Gandy's room had been ransacked, they went to defendant's third floor room where they found "Rabbit" (Warren), "Little Man," Rita and "Jimmy" who was lying across the bed. McCawley, Willis, and Hooker went back to Gandy's room. Willis and Hooker immediately returned to the third floor where they heard Smith[1] begging for his life. Hooker saw defendant holding a sawed-off shotgun. "Jimmy," who was standing nearby and also holding a sawed-off shotgun, searched Willis and Hooker. Defendant then told "Jimmy" to kill Hooker but as a result of Hooker's pleading, his life was spared. Defendant ordered Hooker into a room in which Smith and "Zeke" were standing in a corner and Gandy, partially covered by a sheet, was lying on the floor. Defendant said he was going to "kill all of us E's." As he talked about how the "E's" had "squared up on him

---

[1] Hooker's testimony does not clearly reveal when or with whom Smith entered defendant's room.

for stealing them turkeys and stuff" and how Gandy tried to rape defendant's girlfriend, Smith jumped out the window. Warren listened to Gandy's heart and said "He still living." "Zeke" and Willis were released and defendant again threatened to kill Hooker who again successfully pleaded for mercy. Defendant stated, "I'm not going to kill you, Hooker. You can go on in the next room. But Gandy must die." Defendant then shot Gandy in the back and fled. Hooker, Patrick and Willis left the building and called the police. Smith, Gandy, Willis, Patrick and Hooker were all members of the "East Side Executioners."

Based upon a pathological report and protocol, the State and defense stipulated that Gandy's death was caused by a BB shot wound of the head and brain.

The evidence presented by the defense is summarized as follows.

Wendell Mc Morris, a member of "The Syndicate," testified that he knew Gandy, Hooker, Willis and Smith, all of whom carried a shotgun and were "known to shoot people." On December 23, 1969, Gandy threatened to kill defendant if he ever asked about a television again.

Defendant testified in his own behalf that prior to December 26, 1969, he used heroin and was convicted for burglary. He lived in an apartment on the third floor at 117 North Albany. Approximately three days before Christmas defendant asked Gandy what he did with defendant's television. Gandy's response was a threat to kill defendant. Gandy, who always carried a gun, Willis, Smith and Patrick were members of the "Executioners." Some friends told defendant that Gandy tried to rape Rita Cain, defendant's girlfriend. He went immediately to his apartment where Rita Cain told him Gandy had "climbed on top of her." He noticed that some food was missing from his apartment. After drinking some wine (he had already taken some "dope") he was told that Gandy and some others were coming to kill defendant and every "Syndicate" in the building. Defendant, carrying a gun, entered a closet where he could hear the noises from the room. The closet door was thrust open to reveal Gandy, holding "something silver" in his hand and peeping into the closet. Defendant got out of the closet and said, "Hey, Jack, you did me wrong. Man, What are you doing? Why don't you go out of my house? You tried to rape my woman. You took my television. What do you want now?" Defendant shot Gandy after Gandy moved his hand, which defendant believed held a gun. Smith jumped out of the window. Although defendant did threaten to kill Hooker, who defendant believed took his food, defendant did not threaten to kill Smith or the "E's." Defendant did not know anyone named Jimmy. After some indecision defendant said that he shot Gandy a second time because he thought Gandy, who was on the floor, was going to again try to shoot him. After

the incident, defendant noticed that the lock to his apartment was broken.

The court asked the prosecutor whether any weapons, other than defendant's, were found. The prosecutor responded, "No."

*Opinion*

■ (1) In contending that he was not proven guilty of voluntary manslaughter beyond a reasonable doubt defendant asserts that there was credible evidence of self-defense and that the testimony of the defense witnesses was more credible than the evidence presented by the State. The trial judge, however, must have given considerable credence to some of the defense evidence or he would have found defendant guilty of murder. The evidence demonstrates that Gandy and his friends went to defendant's room where they were met by defendant and others. Defendant's claim that the killing was in self-defense is based upon his testimony that he shot Gandy only after he moved his hand which held "something silver." That testimony is not corroborated by any other testimony or by the discovery of physical evidence at the scene of the shooting. The evidence does indicate that defendant, who earlier that night had taken some "dope" and drank some wine, was frightened by the confrontation and, keeping Gandy's threats in mind, killed Gandy while under the unreasonable belief that such was necessary for the defense of his person and not because Gandy attacked. This conclusion is buttressed by the lack of corroboration of defendant's testimony that Gandy was the aggressor. Thus a conviction for voluntary manslaughter under Ill. Rev. Stat. 1969, ch. 38, par. 9—2(b) [2] was appropriate.

■■ Although defendant cites numerous bits of testimony which allegedly support his theory, his entire argument, when reduced to its essence, relates to the credibility to be attached to the testimony of various witnesses. It is not the function of this court to make a determination of the credibility of witnesses as such has properly been assigned to the trier of fact whose finding will be reversed only where the evidence is *so* unsatisfactory as to leave a reasonable doubt of defendant's guilt. (*People v. Morehead* (1970), 45 Ill.2d 326, 329, 259 N.E.2d 8, 10, *cert.* denied, 400 U.S. 945 (1970).) Examination of the evidence adduced at the trial of this case, including consideration of each of the numerous bits of testimony discussed in defendant's brief, reveals that this is not an appropriate case for reversal.

■■ (2) Defendant contends that his sentence is excessive and therefore

---

[2] A person who intentionally or knowingly kills an individual commits voluntary manslaughter if at the time of the killing he believes the circumstances to be such that, if they existed, would justify or exonerate the killing under the principles stated in Article 7 of this Code, but his belief is unreasonable.

should be reduced. The sentence, however, is within the limits prescribed by the Legislature for voluntary manslaughter [3] and it is not at variance with the purpose and spirit of the law or in excess of the proscriptions found in the Illinois constitution. (*People v. Taylor* (1965), 33 Ill.2d 417, 424, 211 N.E.2d 673, 677 and *People v. Miller* (1965), 33 Ill.2d 439, 444—445, 211 N.E.2d 708, 712.) Thus it will not be reduced.

The judgment is affirmed.

Judgment affirmed.

DRUCKER and ENGLISH, JJ., concur.

---

[3] Ill. Rev. Stat. 1969, ch. 38, par. 9—2(c).